710 So.2d 152 (1998)
QUIX SNAXX, INC., a Florida corporation, and Quix Snaxx, International, Inc., Appellants,
v.
Richard H. SORENSEN and Sorensen EE Konsultants, Inc., Appellees.
No. 97-2843.
District Court of Appeal of Florida, Third District.
April 22, 1998.
Michael R. Seward, Key Largo; Marc A. Kuperman, Miami, for appellants.
*153 Richman Greer Weil Brumbaugh Mirabito & Christensen and Gerald Richman and M. Margaret Haley, Miami, for appellees.
Before NESBITT, LEVY and SORONDO, JJ.
NESBITT, Judge.
Richard Sorensen and Sorensen EE Konsultants, Inc., also known as SEEK, Inc. (referred to herein collectively as Sorensen), brought the instant breach of contract action, arguing that as the third party beneficiary of a Purchase Order Agreement, Sorensen was entitled to royalty payments from Quix Snaxx, Inc., and Quix Snaxx International, Inc.,(referred to herein collectively as QS). QS maintained that a contemporaneously executed License Agreement required that Sorensen arbitrate the claim. In the instant appeal, QS argues that the trial court erred in denying its Motion to Compel Arbitration. We agree and reverse the order under review. The names of the companies involved in the instant dispute changed at several junctures, however the following is an abbreviated synopsis of the facts.
Years before the instant claim, Sorensen had invented a french fry vending machine. Sorensen founded, and was president and director of the French Fry Company (FFC), which planned to manufacture and market the machine. Geraldine A. Trainor invested in FFC. A working prototype of the machine was not completed as provided under the terms of the loan agreement and Trainor filed a federal action for breach of contract. The parties came to a settlement whereby they would divide the world as far as the manufacture and distribution of these machines. The settlement agreement provided that FFC would give the license to SEEK, Inc. (a Sorensen company) for some countries, and give the license to QS (a company owned by Trainor) for other enumerated countries, the later commitment to be fulfilled by the License Agreement mentioned above. It was this agreement that contained an arbitration clause.[1]
Also as part of the settlement agreement FFC promised that "a condition of the license from [FFC] to [QS] is that [QS] be required ... to place a purchase order with [FFC] for the purchase of 1000 machines", to be manufactured by SEMCO (a now defunct Sorensen company). That Purchase Order Agreement provided that Sorensen would receive a royalty of $250 for each machine. Sorensen claimed breach of that provision of the Purchase Order Agreement, arguing that the machines had never been purchased and Sorensen had never been paid.
Documents executed by the same parties, on or near the same time, and concerning the same transaction or subject matter are generally construed together as a single contract. Where a writing expressly refers to and sufficiently describes another document, the other document, or so much of it as is referred to, is to be interpreted as part of the writing. See United States Rubber Products, Inc. v. Clark, 145 Fla. 631, 200 So. 385, 388 (Fla.1941); Citicorp Real Estate, Inc. v. Ameripalms 6B GP, Inc., 633 So.2d 47,49 (Fla. 3d DCA 1994); Hurley v. Slingerland, 461 So.2d 282, 284 (Fla. 4th DCA 1985); Edelblut Const. Co. v. Free, 149 So.2d 360, 364 (Fla. 2d DCA 1963); Diana Stores Corporation v. M. & M. Electric Co., 108 So.2d 486, 487-88 (Fla. 3d DCA 1959)(determining that the amount of work to be performed by the subcontractor should be determined by examining the prime contract specifications); Collins v. National Fire Insurance Co., 105 So.2d 190, 194-95 (Fla. 2d DCA 1958)(holding that where a written contract refers to and sufficiently describes another document, that other document or so much of it as is referred to may be regarded as a part of the contract and therefore is properly considered in its interpretation); See also 7 Fla. Jur., Contracts, § 79.
Here, the Purchase Order Agreement is dated February 8. The License Agreement and Settlement Agreement are dated February 12. The documents were all executed *154 within a span of days, as part of an orchestrated effort to settle pending federal litigation. It was pursuant to Paragraph 4 of the Settlement Agreement that FFC had issued the license to QS., and section 10.4 of the License Agreement contains the arbitration provision. Sorensen signed the federal Settlement Agreement in his capacity as President of FFC, and the License Agreement both in his representative capacity and individually. The License Agreement makes specific reference and description of the royalty and the License Agreement refers to the Purchase Order Agreement.
The Purchase Order Agreement refers to the License Agreement, acknowledging QS's obligation to pay Sorensen a royalty for manufactured machines as an obligation created by the settlement and particularly Article 5, Paragraph 5.3 of the License Agreement between FFC and QS.[2] Sorensen signed the Purchase Order Agreement also, this time in his capacity both as president of FFC and as president of SEMCO, the Sorensen company that was supposed to manufacture the machines.
While we agree with citation to the general rule that a mere reference to another document is not sufficient to incorporate that other document into a contract, see Kantner v. Boutin 624 So.2d 779, 781 (Fla. 4th DCA 1993), we cannot agree with Sorensen's position that absent magic "subject to" language, the trial judge was obligated to consider the Purchase Order Agreement in a vacuum. The Purchase Order Agreement itself acknowledged that it was made "in compliance and as part of a settlement agreement." The License Agreement was part of the Settlement Agreement executed at the same time and attached to the settlement agreement. The Purchase Order Agreement, recital D.[3], requires compliance with the License Agreement to get a royalty and, again, the License Agreement unequivocally provides for mandatory arbitration.
In sum we conclude that the License Agreement and the Purchase Order agreement, both referring to the royalties and referring to each other, were contemporaneously executed documents obligating Sorensen to arbitrate his claim. Accordingly, we reverse the order under review and remand for further proceedings in compliance with the statements made herein.
NOTES
[1] Paragraph 10.4 of the License Agreement provides:

Disputes. Any disputes or disagreements between the parties that can not be resolved between the parties must be submitted to an independent arbitrator agreed to by both parties for a final resolution that will be abided to by both parties.
[2] Paragraph 5.3 of the License Agreement provides:

Royalty Payments. In compliance with the Patent assignment agreement between Richard Sorensen and FFC, for each and every machine operated under this License Agreement, by INT or any sub-license holders, a payment of $250.00 per machine as set forth in the Purchase Order Agreement. A Royalty of $.025 per revenue serving shall be deducted from Potato Product revenues (Sub-Para. 5.1 above). Both payments will be paid into a royalty escrow account for the benefit of Richard Sorensen, his heirs or his assigns.
[3] Recital D of the Purchase Order Agreement provides:

In compliance with and as part of the above referenced settlement agreement, the Royalty Payments (Article 5, Para. 5.3 of a License Agreement between the parties) due to Richard Sorensen of $250.00 per machine will be included in the purchase price of the machines. FFC will place that portion of the purchase price ($250.00) into an escrow account to be designated by Richard Sorensen.